IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

KAREN JO BARROW,                    §
                                    §
              Plaintiff,            §
                                    §  Civil Action No. 3:00-CV-0913-D
VS.                                 §
                                    §
GREENVILLE INDEPENDENT SCHOOL       §
DISTRICT, et al.,                   §
                                    §
              Defendants.           §

MEMORANDUM OPINION
AND ORDER

In this action by plaintiff Karen Jo Barrow ("Barrow") against defendants Greenville

Independent School District ("GISD") and Dr. Herman Smith ("Dr. Smith"), the court addresses the

remaining post-judgment matters that require a decision: Barrow's application for attorney's fees

from Dr. Smith, the deferred portion of her motion to alter or amend the judgment, and her

objections to GISD's bill of costs.  For the reasons that follow, the court awards Barrow attorney's

fees in the sum of $631,293.00, and $22,775.22 in expenses and taxable costs of court; it grants her

motion to alter or amend the judgment to the extent of awarding her expenses and taxable costs

against Dr. Smith; and it sustains in part and overrules in part her objections to GISD's bill of costs

and awards costs to GISD of $14,492.65.

I

The court assumes the parties' familiarity with its prior opinions in this case.  In its most

recent decision, *Barrow v. Greenville Independent School District*, 2005 WL 1867292 (N.D. Tex.

Aug. 5, 2005) (Fitzwater, J.) ("*Barrow VI*"), the court established a procedure for Barrow to submit,

and for Dr. Smith to oppose, an application for attorney's fees under 42 U.S.C. § 1988.[1]

Barrow seeks an award of attorney's fees and expenses totaling $2,093,521.91, which consists of $1,989,360.50 in attorney's fees and $104,161.41 in expenses.[2]  She requests an attorney's fees award for work performed by four attorneys: Wm. Charles Bundren, Esquire ("Bundren"); Kelly J. Shackelford, Esquire ("Shackelford"); Hiram S. Sasser III, Esquire ("Sasser"); and Jonathan M. Saenz, Esquire ("Saenz").  Bundren is Barrow's lead counsel in the case.  Bundren practices law with Wm. Charles Bundren & Associates, P.C. ("WCBA").  Shackelford is the founder and Chief Counsel of Liberty Legal Institute ("Liberty"), a civil liberties education and legal defense organization specializing in religious freedom cases.  Sasser is Liberty's Director of Litigation, and Saenz is a Liberty Staff Attorney.  Dr. Smith opposes Barrow's fee application on several grounds, asserting that the court should reject the request in its entirety or, alternatively, should award a substantially reduced amount.

Barrow requests compensation for Bundren's services based on 3,703.85 hours at the hourly rate of $450, totaling $1,666,732.50.  For Shackelford's work, Barrow requests compensation based

---

[1]Barrow filed a preliminary attorney's fees application on April 11, 2005.  In accordance with *Barrow VI*, she filed the instant fee application on August 25, 2005 (amended on September 6, 2005), supported by a brief and a seven-volume appendix.  Dr. Smith filed his response and objections, a supporting brief, and an appendix on September 13, 2005.  As permitted by *Barrow VI*, he adopted materials already on file consisting of the response, brief, and six-volume appendix filed June 14, 2004, and supplement to response filed June 23, 2004, which he had submitted as part of an attorney's fees alternative dispute resolution ("ADR") procedure presided over by Judge Sanders, and Judge Sanders' June 27, 2004 report.  (Although the ADR procedure has been referred to as "arbitration," it is best described as a voluntary, non-binding ADR procedure in which the parties participated in an attempt to settle the case before trial.)  Barrow filed a reply brief on September 28, 2005.

[2]As directed in *Barrow VI*, in her first amended attorney's fees application, Barrow has broken these sums out to show that amount as of the dates of the offers of judgment.  *See* P. Am. Applic. 1-3.

on WCBA's time records for 320.1 hours at $400 per hour and based on Shackelford's separate time records for 248.2 hours at the same hourly rate, for 568.3 hours totaling $227,320.  Barrow seeks fees for 220.6 hours at $205.00 per hour for Sasser's services, totaling $45,223.00.  Finally, she requests compensation for 286.2 hours at $175.00 per hour for Saenz's services, totaling $50,085.00.

To support the fee application, Barrow has submitted four sets of billing records.  First, she has proffered WCBA's records, which include all of Bundren's time entries.  They also include Shackelford's time entries prior to June 23, 2004, although Shackelford was associated with Liberty, not with WCBA, throughout the history of the case.[3]  Second, Barrow has submitted Shackelford's separate time sheets for his work on and after June 23, 2004.  Third and fourth, she has submitted separate time records for Sasser and Saenz, respectively.

Also pending before the court is the deferred portion of Barrow's April 11, 2005 post-trial motion to alter or amend the judgment.  In a memorandum opinion and order filed in conjunction with entering the judgment in this case, the court explained that, with respect to Barrow's action against Dr. Smith, the judgment provided that Barrow would bear her own taxable costs of court, subject to the court's amending the judgment in response to a timely filed post-judgment motion.  *See Barrow v. Greenville Indep. Sch. Dist.,* No. 3:00-CV-0913, slip op. at 1-2 (N.D. Tex. Mar. 25, 2005) (Fitzwater, J.).  Barrow challenged this part of the judgment in her motion to alter or amend judgment.  In *Barrow VI* the court denied the motion except to the extent it deferred a final decision due to the outstanding issue of Barrow's recovery of attorney's fees and costs.  *See Barrow VI*, 2005 WL 1867292, at *32.  The court addresses today whether the judgment should be altered or amended

---

[3]According to Shackelford, until mid-2004, his time records were forwarded to Bundren to be input into his firm's computerized timekeeping system.

to assess Barrow's expenses and taxable costs of court against Dr. Smith.

The judgment awarded GISD its taxable costs of court against Barrow, and the clerk of court taxed GISD's costs in the sum of $19,741.13.  On April 13, 2005 Barrow filed objections to GISD's bill of costs.  In *Barrow VI* the court deferred its decision on her objections.  *Id.*  The court also resolves Barrow's objections in this opinion.

## II

The court turns first to Barrow's first amended attorney's fees application.  Barrow is entitled under the judgment to recover from Dr. Smith actual and punitive damages and prejudgment interest totaling $38,422.44 on her parental rights claim under 42 U.S.C. § 1983.[4]  In a § 1983 case, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs[.]" 42 U.S.C. § 1988(b).  Although § 1988 uses the word "may," the court's discretion to deny attorney's fees to a prevailing party is extremely narrow.  *See Scham v. Dist. Courts Trying Criminal Cases*, 148 F.3d 554, 557 (5th Cir. 1998).  "Absent special circumstances that would render such an award unjust, a prevailing plaintiff should be awarded § 1988 fees 'as a matter of course.'" *Id.* (quoting *Espino v. Besteiro*, 708 F.2d 1002, 1005 (5th Cir. 1983)).

To calculate the amount of a reasonable attorney's fee, the court begins by "determin[ing] the compensable hours from the attorneys' time records, including only hours reasonably spent."

---

[4]This calculation is based on $15,455.00 in actual damages, prejudgment interest (which Barrow calculates to be $2,967.44), and $20,000 in punitive damages.  Adding these sums together, Barrow obtained a judgment in the amount of $38,422.44.  *See Barrow VI*, 2005 WL 1867292, at *22 ("Barrow points out that the court awarded her judgment for $15,455.00 plus prejudgment interest, which she calculates to be $2,967.44. The judgment also awarded her $20,000 in punitive damages. Adding these sums together, Barrow obtained a judgment in the amount of $38,422.44.").

*Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993). The court may reduce the number of compensable hours "[w]here the documentation of hours is inadequate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). The court also excludes any hours that it determines "are excessive, redundant, or otherwise unnecessary." *Id.* at 434. The court next "must select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases." *Shipes*, 987 F.2d at 319. "The number of compensable hours is then multiplied by the selected hourly rate to produce the 'lodestar' amount." *Id.*; *see also Rutherford v. Harris County, Tex.*, 197 F.3d 173, 192 (5th Cir. 1999) (citing *League of United Latin Am. Citizens #4552 v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997) ("*LULAC*")). The fee applicant bears the burden to substantiate both the requested hours and the hourly rate. *Hensley*, 461 U.S. at 437. After calculating the lodestar amount, the court must then determine whether the lodestar should be adjusted based on the factors listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). *Shipes*, 987 F.2d at 320.

## III

Relying on the materials he submitted to Judge Sanders as part of a pretrial attorney's fees alternative dispute resolution ("ADR") procedure[5] and Judge Sanders' report, Dr. Smith contends

---

[5]As the court notes *supra* at note 1, in *Barrow VI* it permitted the parties in litigating this fee application to adopt materials already on file. Dr. Smith has adopted materials submitted to Judge Sanders as part of the ADR procedure. Therefore, to understand Dr. Smith's opposition arguments, it is necessary to consult his September 13, 2005 response and objections to plaintiff's fee application, September 13, 2005 brief in support of response and objections to plaintiff's fee application, June 14, 2004 response and objections to plaintiff's fee application (including volume 1, which contains his brief), and the supporting appendixes filed on June 14, 2004 and September 13, 2005.

For clarity, when the court refers in this memorandum opinion to "D. Br." it means Dr. Smith's September 13, 2005 brief in support of response and objections to plaintiff's fee application. When the court refers to "D. ADR Br." it means the brief included in volume 1 of Dr. Smith's June

that Barrow is not entitled to recover any attorney's fees, expenses, or costs, and he requests that the court adopt Judge Sanders' conclusion that the evidence is insufficient to sustain an award of expenses or costs. The court will not deny Barrow's fee application on this basis.

Although the court's decision today reaches conclusions that are in some respects similar to those found in Judge Sanders' report, Judge Sanders issued his findings as part of a non-binding ADR procedure.[6] The court must independently perform its obligation to decide Barrow's fee application. "Absent special circumstances that would render such an award unjust, a prevailing plaintiff should be awarded § 1988 fees 'as a matter of course.'" *Scham*, 148 F.3d at 557 (quoting *Espino*, 708 F.2d at 1005). Although the court concludes that Barrow's fee request must be substantially reduced, it also finds that there are no special circumstances that support completely denying her an award of attorney's fees.

IV

Dr. Smith maintains on several grounds that Barrow's fee request should be rejected in its entirety or drastically reduced. He contends that Barrow has failed to meet her burden of proof because no reasonable client would accept her counsels' records due to the use of block billing. Dr. Smith also posits that Bundren's available time records are facially unreliable because the

---

14, 2004 ADR response and objections to plaintiff's fee application. When the court refers to "D. ADR Resp." it means the response and objections included in volume 1 of Dr. Smith's June 14, 2004 response and objections to plaintiff's fee application. When the court refers to "D. ADR Resp." by a volume and page designation, e.g., D. ADR Resp. 2:1, it means the volume and page of a volume other than volume 1 of Dr. Smith's June 14, 2004 response and objections to plaintiff's fee application. By "D. ADR Resp. Supp." it means Dr. Smith's June 21, 2004 supplement to his response and objections to plaintiff's fee application.

[6]The court is especially grateful to Judge Sanders for his willingness to preside over the ADR procedure and for the time he devoted to the matter.

computerized records have been massively altered and Bundren claims to have worked an inhuman number of hours.

A

The court turns initially to Dr. Smith's objection to Barrow's counsels' use of block billing. Dr. Smith argues that block billing is not a normal business practice in this community and that it is prohibited by law, learned treatises, and responsible clients.  He maintains on this basis that the court should reject Barrow's fee application in its entirety or, alternatively, reduce the number of hours by 75% to 85%.

"The term 'block billing' refers to 'the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks.'" *Robinson v. City of Edmond*, 160 F.3d 1275, 1284 n.9 (10th Cir. 1998) (quoting *Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1554 n.15 (10th Cir. 1996)).  All of Bundren's time entries before May 1, 2004 are block billed.  On May 1, 2004 Bundren began using a different entry for each task rather than for each day, and he continued this practice through the end of the fee application period.[7]  All of Shackelford's time entries prior to February 16, 2005—including those contained in the WCBA billing records and in his separate records—are block billed.  On and after February 16, 2005 Shackelford did not uniformly block bill, although some entries continue to group several tasks together.  Sasser's and Saenz's time entries do not appear to be block billed.

Courts disfavor the practice of block billing because it impairs the required reasonableness

---

[7]In her reply brief, Barrow asserts that Bundren ceased this practice after May 1, 2004 "because of Smith's complaining."  P. Reply Br. 6 n.15.

- 7 -

evaluation.  When time records are block billed, the court cannot accurately determine the number of hours spent on any particular task, and the court is thus hindered in determining whether the hours billed are reasonable.  *See Trulock v. Hotel Victorville*, 92 Fed. Appx. 433, 434 (9th Cir. 2004) (unpublished mem.) ("[B]lock billing creates some impediments to the analysis of attorney fee bills. . . ."); *Gratz v. Bollinger*, 353 F.Supp.2d 929, 939 (E.D. Mich. 2005) ("As a result of such 'block billing,' the Court is not able to determine the number of hours expended on each discrete task. Thus the Court cannot determine whether the number of hours billed are reasonable."); *Aiello v. Town of Brookhaven*, 2005 WL 1397202, at *3 (E.D.N.Y. June 13, 2005) ("[B]lock billing would impede the Court's ability to ascertain the nature of the work performed."); *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 2005 U.S. Dist. LEXIS 15311, at *10 (D. Ore. Mar. 7, 2005) (Block billing "prohibit[s] a thorough reasonableness determination."); *Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 277 F.Supp.2d 323, 326 (S.D.N.Y. 2003) ("[T]he substantial amount of block billing in the fee requests renders it difficult to determine whether, and/or the extent to which, the work done by Buyers's attorneys is duplicative or unnecessary.").  The Tenth Circuit, for example, strongly discourages the practice of block billing.

> The use of billing practices that camouflage the work a lawyer does naturally and quite correctly raise suspicions about whether all the work claimed was actually accomplished or whether it was necessary. This concern is particularly important in a situation where a party is seeking to have his opponent pay for his own lawyer's work.

*Robinson*, 160 F.3d at 1284.

An example from Bundren's time records demonstrates the difficulty his block-billing practice creates for the court.  On September 5, 2001 Bundren billed 8.0 hours.  Rather than separate his work into more discrete entries or categories, he combined all his tasks into the following single

entry (the description is so long that it spills over into a second entry):

> Receipt and review of correspondence from Tom Brandt, Esq. regarding defendant's "latest version" of proposed Joint Status Report on settlement negotiations and length of trial; review Joint Status Report "latest version" proposed by Dr. Herman Smith; preparation of correspondence with Kelly Shackelford; telephone conversation with Kelly Shackelford regarding Defendant's proposed Joint Status Report concerning settlement progress and settlement negotiations; review local rules and Federal Rules of Civil Procedure regarding information and "argument" of counsel included within a Joint Status Report to the Court; telephone conference with Court's secretary regarding proper content of Joint Status Report on settlement negotiations; preparation of correspondence to Tom Brandt, Esq. and Cobby Caputo, Esq. regarding Plaintiff's Objections to Defendant's case and improper conduct of Defendants reported in the proposed Joint Status Report; research Northern District's civil expense and delay reduction plan and confidentiality of ADR proceedings under Section III., F. of Northern District Plan; legal research regarding Texas statutes on alternative dispute resolution mediation session; review mediation files concerning contract and agreements signed by parties to keep communications at ADR proceedings confidential; continued legal research concerning motivating factors of Dr. Herman Smith in making decision to not promote or recommend Karen Jo Barrow for an administrator's position and mixed motive cases under Title VII and under employment discrimination under Section 1983; (continued next item)

> (cont from prev. slip) continued legal research concerning Dr. Herman Smith's assertion of a "Mt. Healthy" defense based upon motivating factors which Dr. Herman Smith did not know in July of 1998; continued review of deposition transcripts, deposition exhibits and evidence to determine viability of Dr. Herman Smith's "Mt. Healthy" defense based upon other motivating factors which caused him to discriminate against Karen Jo Barrow; review Defendants' proposed language in Joint Status Report to the Court; preparation of draft of Plaintiff's proposed insert (alternative) to Defendants' proposed language in Joint Status Report.

P. App. 545.  Because of the block billing, the court cannot accurately determine how much of the

8.0 hours Bundren devoted to any particular task, or even to a category of tasks, within the day.

Although the example the court cites is particularly problematic, there are several others like it.  The records reflect that Bundren typically compiled together into one day's entry such discrete tasks as reviewing notes, preparing for discovery, writing correspondence, drafting pleadings, and conducting legal research.

Another example sheds additional light on the challenge that block billing creates for the court.  Throughout April 2001 Bundren has seven billable entries that include communications with Shackelford.[8]  Because all the entries are block billed, the court can only conclude that, during a one month period, Bundren spent somewhere between 0.7 hours and 47.7 hours communicating with Shackelford.  This wide range is found in only a single month; the problem is compounded when the  entries are extrapolated over the entire 1998-2004 block-billing period.  Given the vastness of the range, the court cannot determine, *inter alia*, the reasonableness of the time Bundren billed for communicating with Shackelford.

Shackelford also engaged in block billing, but his time records are generally more illuminating.  While Bundren's individual time entries often contain five or more tasks, Shackelford usually performed only a single task during a particular day; on the days he bills for more than one, only two or three tasks are usually grouped together.

Most courts that have addressed the problem of block billing have concluded that denying all block-billed attorney's fees is not an appropriate remedy.  *See, e.g.*, *Trulock*, 92 Fed. Appx. at 434 (holding that block billing "is not a basis for refusing to award attorneys' fees"); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1215 (10th Cir. 2000) (concluding that block billing "is not *per se* forbidden"); *Rodriguez v. McLoughlin*, 84 F.Supp.2d 417, 425 (S.D.N.Y. 1999) ("[T]he practice

---

[8]These entries are found on April 3, 5, 11, 23, 26, 27, and 30, 2001.

of block billing is not prohibited in [the Second] Circuit.").   Rather, most courts reviewing block-billed time entries have performed a percentage reduction either in the number of hours or in the lodestar figure.  *See, e.g.*, *Paris v. Dallas Airmotive, Inc.*, 2004 WL 2100227, at *9-*11 (N.D. Tex. Sept. 21, 2004) (Lindsay, J.) (applying percentage reduction because of block billing); *Robinson*, 160 F.3d at 1284-85 ("[A] district court does not abuse its discretion in reducing a plaintiff's fee request when the request is based on time records that are rather sloppy and imprecise.") (internal quotation omitted); *Aiello*, 2005 WL 1397202, at *3 ("[C]ourts apply percentage cuts where there is a substantial amount of block billing in a fee request.") (internal quotation omitted).   The reduction usually ranges between 10% to 30%.  *See, e.g.*, *In re Pierce*, 190 F.3d 586, 594 (D.C. Cir. 1999) (applying 10% reduction); *Gratz*, 353 F.Supp.2d at 939 (same); *Aiello*, 2005 WL 1397202, at *3 (same); *Welch v. Metro. Life Ins. Co.*, 2004 U.S. Dist. LEXIS 28576, at *10 (C.D. Cal. Sept. 20, 2004) (block billing "can result in overbilling of between 10 and 30 percent."); *Okla. Natural Gas Co. v. Apache Corp.*, 355 F.Supp.2d 1246, 1265 (N.D. Okla. 2004) (adopting magistrate judge's 15% reduction in case applying Oklahoma fee-shifting statute); *Sea Spray*, 277 F.Supp.2d at 326 (applying 15% reduction); *Gonzalez v. Bratton*, 147 F.Supp.2d 180, 213 (S.D.N.Y. 2001) (applying 12% reduction).

Based on Bundren's extensive block billing in this case, which occurred over a substantial time period, the court will reduce Barrow's request for Bundren's time by 20% for services rendered between August 27, 1998 and May 1, 2004.  Because Shackelford engaged in some block billing, the court will reduce Barrow's request for Shackelford's time by 10% for services rendered between September 22, 1998 and February 15, 2005.  From the time records submitted, the court has determined that Bundren billed 2,177.15 of his claimed hours between August 27, 1998 and May

- 11 -

1, 2004.[9]   The court reduces that number to 1,741.72 hours based on the 20% block billing adjustment.  The remaining 1,526.7 claimed hours have not been reduced on this basis.  The court has determined that Shackelford block-billed 340 of his claimed hours from September 22, 1998 through February 15, 2005.[10]   The court reduces that number to 306 hours based on the 10% block billing adjustment.  The remaining 228.3 claimed hours (i.e., 568.3 - 340) have not been reduced on this basis.

The court disagrees with Dr. Smith's reliance on *Walker v. U.S. Department of Housing & Urban Development*, 99 F.3d 761 (5th Cir. 1996), to contend that the court should deny Barrow's application in its entirety based on her counsels' practice of block billing.  In *Walker* the Fifth Circuit held that a paralegal's billing records were "woefully inadequate to support any fee application" because, *inter alia*, all the time was block billed.  *Walker*, 99 F.3d at 773 (The billing records "never separate out her day, always lumping all of the day's activities together.").  *Walker*, however, is distinguishable from this case.  The *Walker* panel based the denial of the paralegal's fees both on block billing and on the fact that the records were too vague.  *See id.* ("The original records contain terse listings: 'library research,' 'analyzing documents,' 'reading background documents,' 'phone interviews,' with no further explanation.").  As the court explains later, although some of Bundren's and Shackelford's entries are vague, the records do not suffer from the same pervasive

---

[9]The court reached this finding by deducting from the 2,667.05 hours he claimed for the period August 27, 1998 through September 7, 2004 a total of 489.9 hours for the period between May 1, 2004 and September 7, 2004, leaving a net sum of 2,177.15 hours.

[10]The court reached this finding by adding to the total number of hours he claimed between September 22, 1998 and June 22, 2004 in the time records of WCBA (320.1 hours) the sum of 19.9 hours reflected in his own time records for the period June 23, 2004 through February 16, 2005.

vagueness problem found in the *Walker* paralegal's records.[11]   Thus *Walker* does not support

completely denying Barrow's fee request to the extent the application is based on block-billed

time.[12]

B

Dr. Smith maintains that Barrow's application should be rejected in its entirety or drastically

reduced because Bundren's billing records are for two reasons facially unreliable.[13]   First, he posits

that Bundren's original, contemporaneous handwritten time records have been destroyed and his

---

[11]Although a large number of Bundren's block-billed entries contain vaguely described tasks, they are often a small portion of the entire time entry.   For example, the following is Bundren's July 26, 2000 entry, for which he billed 5.6 hours (the vague portions are italicized):

> Preparation of revisions to Response to Request for Production; *preparation of correspondence*; preparation of Request for Production to Greenville Independent School District; *preparation of correspondence with Cobby Caputo, Esq.*; preparation of revisions to Plaintiff['s] Request for Production to Dr. Smith; *telephone conference with client*; preparation of revisions to interrogatories to Herman Smith.

P. App. 485 (emphasis added).

[12]For example, in *Hollowell v. Orleans Regional Hospital LLC*, 217 F.3d 379 (5th Cir. 2000), the Fifth Circuit affirmed an award of attorney's fees even though the billing records "lumped together" the time entries. *Id.* at 392-93.   The district court had "found the . . . billing records specific enough to determine that the hours claimed were reasonable for the work performed." *Id.* at 393.   The Fifth Circuit noted that "even a failure to provide contemporaneous billing statements 'does not preclude an award of fees per se, as long as the evidence produced is adequate to determine reasonable hours.'" *Id.* at 392 n.18 (quoting *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 325 (5th Cir. 1995) (per curiam)).

[13]In his September 13, 2005 brief, Dr. Smith adopts pages 11-13 of his ADR response in support of this argument. *See* D. Br. 7 n.6.   At these pages of his ADR response, Dr. Smith relies on nine examples that he posits are indicia of either gross incompetence or fraud that lead to the conclusion that no responsible client would accept the fee application as supporting a bill.   These objections are either included at other portions of Dr. Smith's opposition briefing and addressed by the court in those contexts or are so conclusory that they do not merit a specific ruling.   Accordingly, the court will not address them here.

computerized records are unreliable because they have been massively and inexplicably altered after the fact during billing judgment review.[14]  Second, he asserts that when Bundren's time records are analyzed together with his fee records in other cases, they indicate that he worked inhuman hours. Dr. Smith relies on an analysis of time records that Bundren submitted in support of Barrow's present fee application, those produced at earlier points in this litigation, and the records that Bundren submitted in support of fee applications in two other lawsuits: *Chiu v. Plano Independent School District*, No. 4:99-CV-1966 (E.D. Tex.), and *Williams v. Kaufman County*, No. 3:97-CV-0875-L (N.D. Tex.) (Lindsay, J.).

Dr. Smith argues that a comparison of the time records that Bundren submitted in support of Barrow's instant and ADR procedure fee applications with time records that she provided during the fall of 2003 indicates that Bundren made massive alterations during his billing judgment review. Dr. Smith supposes that, because under Fifth Circuit precedent billing judgment reductions should be visible to the court, Bundren will contend that these are data entry errors.  He posits, however, that such extensive errors—which account for almost 1,000 hours claimed in Bundren's original records—appear to call into question the validity of the records as a whole.  He points to several specific changes as particularly troubling and argues that these entries support denying the fee application in its entirety.  Included are instances where Bundren removed items from the description of work performed but did not change the amount of time claimed.  In his ADR brief,

---

[14]In his June 14, 2004 ADR response, Dr. Smith objects to the computerized records on the basis that they "are not the best evidence of the time spent on the case." D. ADR Resp. 6.  Although he did not renew this objection in his current response and objections and brief, to the extent he intends to raise an objection under Fed. R. Evid. 1002, the court overrules it.  Such an objection would have merit only if Barrow were relying on the computerized records to prove the content of the handwritten records.

Dr. Smith also cites several instances where, between the time Bundren presented billing records and the time of his ADR fee application, he changed the time allocated or tasks performed. Dr. Smith contends these are not examples of billing judgment but of errors in the records, and he urges that the vast number of alterations renders the records fundamentally unreliable.

Dr. Smith also contends that the time records Bundren presented in *Chiu* and *Williams* undermine the reliability of the records adduced in this case because together they reflect that he regularly worked in excess of what is humanly possible. Among other examples, Dr. Smith cites the period July 5, 2001 through August 7, 2001, which reflects that Bundren took no days off and billed an average of 16.7 hours per day, with no day fewer than 12.5 hours, many days greater than 18 hours, and one day (July 24, 2001) the impossible amount of 24.1 hours.

In 2003 Bundren provided Dr. Smith a copy of his billing records up to that date. Dr. Smith has submitted a copy of the 2003 records as part of the record. Comparing the 2003 billing records with Barrow's instant fee application, it is clear that portions of Bundren's billing records have been significantly altered in the intervening two years. Barrow asserts that Bundren's alterations were performed as an exercise of billing judgment. Bundren also avers that he "found very few data entry errors in the time records." P. App. 39. To conclude that an attorney has exercised billing judgment, the court would expect to find records with some time entries marked as billable and others designated non-billable. *See Alberti v. Klevenhagen*, 896 F.2d 927, 930 (5th Cir. 1990) ("Ideally, billing judgment is reflected in the fee application, showing not only hours claimed, but also hours written off."). The sum of the billable and non-billable hours would reflect the total number of hours the attorney worked on the case. The court would be able to evaluate the attorney's exercise of billing judgment by examining the hours billed and, *inter alia*, comparing them to the hours not

billed.

In several instances, this is what Bundren has done.  For example, Bundren's June 12, 2000 entry shows that he worked 4.8 hours on this case.  He has marked 1.5 hours as "DNB [Do Not Bill] Time," P. App. 477, reflecting that he concluded that only 3.3 hours could reasonably be billed for that day's tasks.  In others, however, rather than mark some or all hours as non-billable, Bundren has simply changed the raw number of hours that he claimed he worked.  For example, Bundren's June 2, 2000 entry has been altered from 7.2 hours in the 2003 records to 5.0 hours in the fee application. For at least two days' time records—July 11 and 12, 2001—all entries for Bundren, Shackelford, and a legal assistant have been completely deleted.  Alterations such as these, which are found throughout the fee application, undermine the assertion that Bundren engaged in billing judgment review.

Having considered Dr. Smith's objections and the relevant records, the court holds that Barrow should be denied attorney's fees based on the unreliability of Bundren's time records.  If Bundren actually worked all the hours reflected in the 2003 billing records and has simply reduced the hours in an exercise of billing judgment—either by marking them as non-billable or by changing the raw number of hours worked—then during 2001 he worked an inhuman number of hours.  When the court adds together the hours Bundren claims he devoted to this case from July 5, 2001 to August 7, 2001 with the hours he billed in *Chiu* and *Williams*, the records indicate that he worked continuously, without taking any days off, and that on no day did he bill fewer than 12.5 hours. During the same period, the records indicate that he billed, on average, 16.7 hours each day, including four consecutive days of in excess of 18 hours.  The records also indicate that on July 24,

2001 he worked the impossible amount of 24.1 hours.[15]

Barrow also asserts that Bundren made the alterations to correct data entry errors.  Bundren avers that law clerk time was inadvertently entered together with his own time from June to September 2001 and that the alterations to the raw hours and descriptions were made to correct these data entry errors.  If so, this perhaps explains why Bundren's records originally reflected his working an "inhuman" number of hours from July 5, 2001 to August 7, 2001.  But this explanation also raises questions that it does not adequately answer.

First, given the number of substantial data-entry errors, the court questions why Bundren asserts in his fee application that he "found very few data entry errors in the time records."  P. App. 39.  Second, it is not apparent how Bundren could have accurately corrected the errors without comparing the time entries to the contemporaneously handwritten time sheets, which are apparently no longer available.[16]  Third, the court questions why Bundren would alter the raw amount of time

---

[15]There are other time entries that cause the court concern.  For example, Bundren's entry on November 2, 2000 contains one task: "Review voice mail from opposing counsel."  P. App. 495.  Bundren billed 0.4 hours for this task.  At 24 minutes, this was either a very lengthy voice mail, it took Bundren a great deal of time to listen to and review it, or both.  Additionally, although both Bundren and Shackelford bill for numerous telephone conferences with each other, Bundren consistently bills more time than Shackelford for the same conversation.

[16]Bundren testified in his deposition as follows:

> Q: All right.  As you sit here today, and in your current computer system, do you know whether or not you have the capability of giving a prebill to the court or to us that will reveal what amount of time you actually wrote down on your handwritten daily time log for a particular day?
>
>       *   *   *
>
> A.  As to each and every day, no.
>
> Q.  (By Mr. Brandt) As to a particular day.
>
> A.  Well, as I said, when I started the prejudgment review process, billing judgment review process in this case, I started with

- 17 -

reflected in several entries without also changing the descriptions of the tasks performed.  For example, the 2003 records reflect that Bundren worked 9.0 hours on September 7, 2001.  The fee application states that he worked 6.0 hours on that day, and all 6.0 hours are marked as billable.  If Bundren removed the 3.0 hours because he discovered that law clerk time had been inadvertently entered with his time on that day, the court would also expect to see the law clerk's *tasks* removed from the description.  Yet the description of Bundren's tasks is exactly the same in the fee application as it is in the 2003 records.  These modifications are not consistent with correcting the inadvertent combination of law clerk time and tasks with Bundren's.

The court does not expect Bundren and his staff to enter all records perfectly the first time; over a seven-year period[17] some data-entry errors will occur.  But the scale of the errors in Bundren's records calls into question the accuracy of Barrow's entire fee application.  Ultimately, the court cannot determine whether Bundren made the alterations in exercising billing judgment or did so to correct data entry errors.  But regardless of the reason, Barrow's attempts to explain the alterations do not address the court's concerns about the reliability of the records, and its ability to rely on the accuracy of the records is materially compromised.

Accordingly, given the magnitude of the changes in relation to the number of hours that Barrow seeks for Bundren's services, the court will reduce Bundren's time by an additional 20% based on the unreliability of the records.  *See Hensley*, 461 U.S. at 433 ("Where the documentation

---

the prebill worksheet, raw data that had come out of the computer.

D. ADR Resp. Supp. Ex. 2 at 297.

[17]Although Barrow filed this lawsuit in 2000, her counsel began providing legal services in 1998.

of hours is inadequate, the district court may reduce the award accordingly."); *Hopwood v. Texas*, 236 F.3d 256, 279 (5th Cir. 2000) (affirming 25% reduction in fee award based, *inter alia*, on inadequate documentation); *LULAC*, 119 F.3d at 1233 ("[D]istrict courts enjoy broad discretion to exclude or reduce hours based on insufficient documentation. . . .").

V

Dr. Smith additionally objects on several grounds that the hours Barrow claims in her fee application were unreasonably expended.  He maintains that (1) the time Barrow requests for pursuing 15 lost motions is unreasonable; (2) the fee application contains unreasonable time for prelitigation activities; (3) the time spent on legal research is unreasonable; (4) the descriptions for many time entries are too vague or ambiguous to be compensable; (5) Barrow unreasonably seeks compensation for clerical tasks at an attorney's rate; (6) Bundren's and Shackelford's participation in two moot courts was unreasonable; (7) time Bundren spent traveling to and attending a continuing legal education ("CLE") session is not compensable; (8) time Bundren spent speaking with the media is not compensable; (9) Barrow seeks compensation for time spent pursuing claims unrelated to the claim on which she prevailed; and (10) various other entries are not compensable.

A

Dr. Smith argues that Barrow should not recover for time Bundren spent on 15 motions[14] that

---

[14]The motions are: (1) Dr. Smith's May 22, 2000 partial motion to dismiss; (2) Barrow's October 3, 2000 motion for leave to take in excess of ten depositions; (3) GISD's June 22, 2001 motion to quash the deposition of Cobby Caputo, Esq.; (4) Barrow's June 29, 2001 motion for leave to take in excess of ten depositions; (5) Barrow's June 29, 2001 motion for temporary restraining order and preliminary injunction; (6) Barrow's July 12, 2001 motion to shorten time to respond to her preliminary injunction application; (7) Dr. Smith's August 1, 2001 motion to extend deadline for designating expert witnesses; (8) Dr. Smith's August 15, 2001 motion to quash and for protective order; (9) Barrow's September 4, 2001 motion to file second amended complaint; (10) Barrow's September 13, 2001 motion to compel Dr. Smith to answer interrogatories; (11) Barrow's September

she lost "unless they are either (1) so intertwined with [her] successes as to be impossible to segregate; or (2) further the progression of the case." D. ADR Br. 46. He implicitly maintains that the motions were neither intertwined with her successes nor furthered the progression of the case.

The court will not deny time spent on these motions solely on the basis that Barrow did not prevail on them. Barrow's lack of prevailing-party status would deny her an award of attorney's fees only on unsuccessful *claims*, not unsuccessful *motions*. *See Hensley*, 461 U.S. at 434-35 (holding that work performed on distinctly different, unsuccessful *claims* is not compensable); *Von Clark v. Butler*, 916 F.2d 255, 259 (5th Cir. 1990) (affirming reduction in hours based on district court's inability to distinguish between hours spent on successful claim and unsuccessful claim).

B

Dr. Smith makes a general and somewhat conclusory objection to the reasonableness of the time Barrow's counsel spent on this case before she filed the lawsuit in May 2000. He posits that the wasted time is particularly egregious when applied to him because he did not become a party to a claim until suit was filed and he had no opportunity to attempt to settle beforehand.

Dr. Smith directs the court to no legal authority for the proposition that the court should not award attorney's fees for time expended before filing suit. Section 1988 does not distinguish between attorney's fees incurred before and after a lawsuit is filed. Prelitigation services are often necessary and desirable, because attorneys can determine that no suit should be filed or can tailor the case to particular parties or to those claims that appear to have merit. The ultimate determination

---

14, 2001 motion to enlarge page limitations; (12) Dr. Smith's September 17, 2001 motion for leave to file two motions for summary judgment; (13) Dr. Smith's September 19, 2001 motion to show cause and for sanctions; (14) Barrow's September 27, 2001 motion for sanctions against Dr. Smith; and (15) Dr. Smith's November 5, 2001 motion to strike Barrow's expert witness.

concerning the amount of fees awardable for prelitigation services is made under the methods and standards that govern fee applications generally.

Moreover, his objection is not sufficiently specific for the court to address it.  A wide array of prelitigation activities would be expected in an employment discrimination-type case, including, *inter alia*, conducting informal discovery, performing legal research, drafting pleadings, undergoing administrative procedures, and sending demand letters.  The only specific reason Dr. Smith cites in his brief for why the prelitigation fees are unreasonable is that the excessive amount may have caused Barrow not to accept defendants' offers of judgment.  This circumstance, even if true, does not of itself demonstrate that the fees are unreasonable.  Thus the court will award reasonable attorney's fees for Barrow's counsel's prelitigation activities.

C

Dr. Smith argues that Barrow's counsel billed for an unreasonable amount of time conducting legal research.  As of the date of the fee application, Bundren's civil litigation experience exceeded 25 years.  Since 1993 he has specialized in representing plaintiffs in civil rights cases. Bundren's experience is relevant not only to what is his reasonable hourly rate but also to what is the reasonable number of hours for him to expend on a case.  *See Rainey v. Phila. Hous. Auth.*, 832 F. Supp. 127, 130 (E.D. Pa. 1993) ("The level of skill and experience claimed by counsel not only informs the Court's judgment as to the appropriate hourly fee but also helps establish how much time counsel reasonably should have spent performing a particular task.").  In his deposition, Bundren opined that in a complex case one might expect a more experienced attorney, commanding a higher rate, to conduct more research than would a novice attorney.  This court cannot accept this premise.  One of the principal reasons a client is willing to pay a higher hourly rate for an

experienced attorney's work is that the attorney can be expected to have sufficient expertise in the relevant field and knowledge of the applicable law to work more efficiently. "[N]ormally the higher the allowed hourly rate commanded based upon skill and experience, the shorter the time it should require an attorney to perform a particular task." *Id.* "A fee applicant cannot demand a high hourly rate—which is based on his or her experience, reputation, and a presumed familiarity with the applicable law—and then run up an inordinate amount of time researching that same law. Double dipping, in any form, cannot be condoned." *Ursic v. Bethlehem Mines*, 719 F.2d 670, 677 (3d Cir. 1983).

Bundren's and Shackelford's practices of block billing make it impossible to know exactly how many hours of legal research are included in the fee application. After extensively reviewing the time records, however, the court agrees with Dr. Smith that the compensation for legal research time that Barrow seeks is unreasonable. In an exercise of billing judgment, Bundren and Shackelford should have written off a much larger amount of legal research time because of their hourly rates. The court deems a 5% reduction in Bundren's billed hours and a 5% reduction in Shackelford's billed hours to be appropriate for unreasonable legal research. *See Hopwood*, 236 F.3d at 279 (affirming a 25% reduction in fee award based on, *inter alia*, lack of billing judgment); *Walker*, 99 F.3d at 770 ("The proper remedy when there is no evidence of billing judgment is to reduce the hours awarded by a percentage intended to substitute for the exercise of billing judgment."). Although a substantial portion of Sasser's and Saenz's billed time is also for legal research, no reduction is necessary because their hourly rates reflect that they would be expected to spend more time on legal research.

D

Dr. Smith objects to several time entries on the ground that they are vague or ambiguous and thus make it impossible to determine whether the activity is compensable and reasonable.[15]

As the fee applicant, Barrow "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended." *Hensley*, 461 U.S. at 437; *see also Bode v. United States*, 919 F.2d 1044, 1047 (5th Cir. 1990) (per curiam) (holding that fee applicant's burden is met "only by presenting evidence that is adequate for the court to determine what hours should be included in the reimbursement"). "In determining the amount of an attorney fee award, courts customarily require the applicant to produce contemporaneous billing records or other sufficient documentation so that the district court can fulfill its duty to examine the application for noncompensable hours." *La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir. 1995) (per curiam) (quoting *Bode*, 919 F.2d at 1047). "The district court may properly reduce or eliminate hours when the supporting documentation is too vague to permit meaningful review." *Id.* at 326. Vague entries are those that are "not illuminating as to the subject matter" or "vague as to precisely what was done." *Id.* Entries such as "revise memorandum," "review pleadings," "review documents," and "correspondence" are sufficiently vague that the court can accept or reject them in a fee application. *See id.* at 326-27, 326 n.11.

Barrow's application contains a host of vague entries, such as "review file," "preparation of correspondence," "review correspondence," "phone conference with co-counsel," "legal research," and "review email." Accordingly, the court will not award attorney's fees for the services described

---

[15]The objections are set out in a chart contained in pages 1-94 of volume 2 of his ADR appendix. *See* D. ADR Resp. 2:1-94.

in these entries.  *See Hensley*, 461 U.S. at 433 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Kellstrom*, 50 F.3d at 326.

Because of block billing, it is impossible to conduct meaningful review and determine the precise number of hours that should be reduced in each time entry due to vague descriptions.  The court has therefore attempted to reach a fair determination by alternate means.  After extensively reviewing the records, the court finds that at least 20% of Bundren's billed time and at least 10% of Shackelford's billed time is based on descriptions that are too vague to support an award of attorney's fees.[16]  The court will therefore further reduce Bundren's billable time by 20% and Shackelford's time by 10%.  *See Hensley*, 461 U.S. at 433 ("Where the documentation of hours is inadequate, the district court may reduce the award accordingly."); *Hopwood*, 236 F.3d at 279 (affirming 25% reduction in fee award based, *inter alia*, on inadequate documentation); *LULAC*, 119 F.3d at 1233 ("[D]istrict courts enjoy broad discretion to exclude or reduce hours based on insufficient documentation. . . .").  Because Sasser's and Saenz's records were not block billed, a more detailed analysis is possible.  After examining the individual entries to which Dr. Smith objects, the court finds that descriptions associated with 2.1 hours of Sasser's billed time and 16.8 hours of Saenz's billed time are inadequately documented and disallows these hours accordingly.

E

Dr. Smith argues that some of the time for which Bundren has billed is for clerical work that does not merit compensation at an attorney's rate. The court agrees that three of the specific entries

---

[16]A thorough review of the records for vagueness reveals that somewhat more than 20% of Bundren's entries and more than 10% of Shackelford's entries are inadequately documented.  The court is satisfied, however, that the reductions it is applying for vagueness together with the significant reductions for block billing are sufficient to encompass the vague and ambiguous entries.

to which Dr. Smith objects contain clerical work.[17]  Time spent on clerical work is not compensable at Bundren's rate.  *See Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989).  Bundren's practice of block billing prevents the court from determining exactly how much time he spent on the clerical tasks.  Concerning the entries to which Dr. Smith objects as clerical, the court finds that approximately one hour is billed for clerical tasks and reduces the fee award accordingly.

F

After the court granted Dr. Smith's summary judgment motion on the basis of qualified immunity, Barrow successfully appealed to the Fifth Circuit.  *See Barrow v. Greenville Indep. Sch. Dist.*, 332 F.3d 844 (5th Cir.) (*"Barrow"*), *cert. denied*, 540 U.S. 1005 (2003).  Before the Fifth Circuit heard the appeal, Bundren participated in two separate moot court arguments: one at the University of Texas at Austin School of Law and one at the University of Houston Law Center. Bundren has billed for the time he spent preparing for, traveling to, and participating in the moot court sessions.  Shackelford has also billed for the time he spent preparing for, traveling to, and attending the moot court session in Austin and organizing the moot court argument in Houston. Shackelford has also billed for the time he spent traveling to and attending oral argument before the Fifth Circuit.  Dr. Smith objects to this time as unreasonable.

The court concludes that it was reasonable for Bundren to participate in one formal moot court session, but not in the other, especially given his experience at that time of approximately 23 years as a litigator and his participation in approximately 12 informal practice sessions.

---

[17]The three entries are as follows: (1) June 23, 2000—"docket deadlines into calendar and docket control," P. App. 480; (2) June 26, 2000—"docket scheduling order and deadlines from scheduling order," *id.* at 481; and (3) June 21, 2001—"review and reorganize documents produced by Greenville Independent School District and exhibits to the depositions following the deposition of LaDayne Wilson and Randy Tarpley," *id.* at 525.

Accordingly, the court will reduce Bundren's time by 13.5 hours for the Austin moot court.

The court finds that, because Bundren alone argued before the Fifth Circuit and is the lead counsel in this case, Shackelford's participation in the Austin moot court session and his time incurred in attending the oral argument in the Fifth Circuit are redundant. Accordingly, the court will reduce Shackelford's time by 23.4 hours. *See Hensley*, 461 U.S. at 434 ("Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are . . . redundant. . . .").

### G

Dr. Smith objects to the six hours that Bundren billed for traveling to and attending a CLE presentation on qualified immunity delivered by Dr. Smith's lead counsel on July 26, 2001. He argues that time spent on CLE is not compensable under § 1988.

In his deposition, Bundren defended billing for this time on the ground that it provided a "golden opportunity" to discern his opposing counsel's mental impressions and to glean his work product on the qualified immunity defense. D. ADR Resp. 6:69. The court agrees with Dr. Smith that Bundren's attendance at the CLE presentation, although perhaps helpful, is not compensable. *See Hensley*, 461 U.S. at 434 ("Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority." (quoting *Copeland v. Marshall*, 641 F.2d 880, 891 (D.C. Cir. 1980) (en banc))). The court will subtract the six hours from Barrow's fee award.

### H

Dr. Smith objects to two of Bundren's billed entries that contain time for speaking with the media about the case. In his deposition, Bundren explained his billing for this time:

> When you're dealing with public entities, it is sometimes helpful to help a case get resolved if you have communications with the media, so that the citizens who are paying the tax dollars for lawyers who are representing the public entity will have an opportunity to petition their government in order to resolve and settle disputes.

D. ADR Resp. 6:69.

Barrow has adduced no evidence that demonstrates that her counsel's conversations with the media helped settle the case. Without evidence of the efficacy of the media conferences, the court will not award her fees for the time that Bundren devoted to them. *See Watkins v. Fordice*, 7 F.3d 453, 458 (5th Cir. 1993) ("[W]e find no abuse of discretion in the district court's exclusion of the press-conference hours, because Appellants did not present any evidence regarding the efficacy of the press conferences. . . ."). Although determining the exact amount of time spent on the media conferences is impossible due to Bundren's practice of block billing, the court finds that it is approximately 3.9 hours. Thus the court will reduce Bundren's time on Barrow's fee award by 3.9 hours.

I

Dr. Smith objects to entries within the fee application concerning claims he believes are unrelated to the single claim on which Barrow prevailed. Specifically, he objects to time spent pursuing a claim against him under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and litigating claims against GISD.

1

Dr. Smith objects to time Barrow's counsel billed for pursuing a Title VII claim against him. When Barrow filed this lawsuit in May 2000, she asserted a Title VII claim against Dr. Smith individually. The court dismissed the cause of action early in the case on Dr. Smith's motion to

dismiss, concluding that he was not Barrow's employer and thus not a proper defendant under Title VII.  *See Barrow v. Greenville Indep. Sch. Dist.*, No. 3:00-CV-0913-D, slip op. at 4 (N.D. Tex. July 14, 2000) (Fitzwater, J.).  Barrow asserts that in an exercise of billing judgment, Bundren has designated all time related to Title VII as non-billable.  Because several time entries with "Title VII" in the description are marked billable, Dr. Smith objects.

Although Barrow did not prevail on her Title VII claim, she is nevertheless entitled to reasonable attorney's fees for services concerning the claim if they are sufficiently related to her parental rights claim, on which she did prevail.  *See Hensley*, 461 U.S. at 434-35.  In *Barrow VI* the court denied Dr. Smith's request to recover attorney's fees for time his counsel expended defending the Title VII claim.  *See Barrow VI*, 2005 WL 1867292, at *28.  The court reasoned that all of Barrow's claims, including her Title VII action, were related to her parental rights claim because each depended on the same set of factual circumstances.  *See id.* at *29.  Based on the court's conclusion in *Barrow VI*, it will not deny Barrow attorney's fees for the few entries that her counsel has not written off and that contain indications that the services in question related in some way to Barrow's Title VII claim.

2

Dr. Smith also objects to time spent pursuing claims against GISD.  Because Barrow was not a prevailing party as to GISD, the court must not award time her counsel spent pursuing claims against GISD that are unrelated to her prevailing claim against Dr. Smith.  Although most of the entries that contain time spent on claims that relate only to GISD have, in whole or in part, been marked "Do Not Bill," some entries remain "Billable."  Although Bundren's practice of block billing precludes an exact determination of the time billed for claims against GISD, the court's best

estimate is that Bundren billed for 14.8 hours that have not as yet been written off. This time will not be awarded.

J

Dr. Smith objects to time Shackelford, Sasser, and Saenz billed for various activities as redundant and duplicative. First, he objects to Sasser's attendance at the interview of witness Susan Crow on March 12, 2005 because Bundren also attended. He argues that it was wasteful for two attorneys to bill for interviewing the witness. The court agrees.

Second, he objects to the time Shackelford and Sasser billed to attend the June 25, 2004 settlement conference before a magistrate judge, contending that one attorney's presence would have been sufficient. The court agrees that Sasser's attendance was redundant and unnecessary, but the court finds that it was reasonable for Shackelford to attend the settlement conference.[18]

Third, Dr. Smith objects to billing for Sasser's attendance at the pretrial conference. Because Bundren and Shackelford were also in attendance, the court agrees that Sasser's attendance was duplicative and that his time is not reasonably compensable.

Fourth, Dr. Smith objects to time billed for Sasser's and Saenz's attendance at trial. He posits that since Shackelford attended and was not responsible for examining witnesses, he could have peformed any other coordination necessary. Barrow has not met her burden of demonstrating why it was necessary for four attorneys to attend trial. Because Sasser's and Saenz's trial attendance was duplicative, the court will not award Barrow attorney's fees for their time attending trial.

---

[18]The court finds that there is a sufficient distinction between the necessity to have two attorneys for the same party participate in a settlement conference, and to have two attend an oral argument where only one attorney will present argument, that the court's reasoning concerning denying Shackelford's moot court and Fifth Circuit argument fees does not apply here.

Accordingly, the court will reduce Sasser's billable time by 114.8 hours and Saenz's billable time by 70.1 hours.

## K

Dr. Smith finally objects to various other entries as being unreasonable. The court recognizes that it is possible that Barrow's fee application seeks compensation for other unreasonably expended time. Dr. Smith has failed in his objections, however, to demonstrate why the entries to which he objects are unreasonable. Additionally, the court is persuaded that the percentage deductions it has already made are sufficient to account for such unreasonable services. Thus the court will make no additional reductions on this basis.

## VI

Having determined the reasonable number of hours to be included in the lodestar calculation, the court next considers the question of reasonable hourly rates.

## A

The hourly rates to be used in the lodestar calculation are determined by "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895 (1984). As the fee applicant, Barrow bears the burden of demonstrating "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Id.* at 895 n.11. Barrow requests $450 per hour for Bundren, $400 per hour for Shackelford, $205 per hour for Sasser, and $175 per hour for Saenz.

As of the date of the fee application, Bundren had been in private-practice civil litigation for over 25 years. Since 1993 he has primarily represented plaintiffs in civil rights cases. He asserts that his current customary hourly rate is $475, although in this case his hourly rate is $450.

Shackelford has 17 years of experience, and his practice also focuses on civil rights, primarily religious freedom. In his affidavit, Shackelford does not indicate what is his current customary hourly rate; he instead asserts that his "reasonable rate *in this case* is $400 per hour," P. App. 62 (emphasis added), and his "hourly rate with regard to *this matter* is $400," *id.* at 66 (emphasis added). In addition to Bundren's and Shackelford's affidavits, Barrow has submitted the affidavits of four attorneys who practice in the Northern District of Texas: Donovan Campbell, Jr., Esquire ("Campbell"), David J. LaBrec, Esquire ("LaBrec"), Robert T. Mowery, Esquire ("Mowery"), and Charles A. Gall, Esquire ("Gall"). Each avers that $450 is a reasonable hourly rate for Bundren and that $400 is a reasonable hourly rate for Shackelford.

Dr. Smith contends the rates Barrow requests for Bundren and Shackelford are unreasonable; he does not challenge the rates for Sasser and Saenz. Dr. Smith maintains that (1) Bundren and Shackelford have never received their claimed historical rates; (2) the court should discount the affidavits of Campbell, LaBrec, Mowery, and Gall because they specialize in areas outside civil rights law, such as commercial litigation; (3) LaBrec's testimony about customary rates contradicts the rates actually charged by and awarded to senior partners in his own firm; and (4) in the two cases in which Bundren was awarded unusually high rates, the defendants did not contest the amount of the claimed rates. Dr. Smith relies on the affidavit of Edward B. Cloutman, III, Esquire ("Cloutman") to rebut the affidavits on which Barrow relies.

B

Dr. Smith first challenges the hourly rates that Barrow requests for the services of Bundren and Shackelford, arguing that they have never received these hourly rates. "When the attorney's customary hourly rate is within the range of hourly fees in the prevailing market, that rate should

- 31 -

be considered in setting a reasonable hourly rate." *LULAC*, 119 F.3d at 1234. Bundren does not indicate what is his current customary hourly rate to fee-paying clients. He asserts that his "current hourly rate for handling matters such as this matter . . . is $475." P. App. 47. But he does not state that he has ever been paid at this rate. Shackelford likewise opines concerning what is reasonable in this case, but he does not aver that he has been paid by other clients at this rate. Moreover, apart from the fees awarded in other cases in which Bundren or Shackelford participated, Barrow has not submitted any evidence of the attorneys' customary rates.[19] Thus in setting a reasonable hourly rate, the court cannot consider the customary hourly rates that Bundren and Shackelford have charged and been paid.

Dr. Smith also argues that the court should discount the affidavits of Campbell, LaBrec, Mowery, and Gall, each of whom practices in the area of complex civil litigation. The court is aware from its experience over the years with several of these attorneys that they are highly skilled and ethical practitioners. Nevertheless, although some of them have experience in civil rights litigation, none purports to focus his law practice on this area of the law. The prevailing market rate is the rate charged "for *similar services* by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11 (emphasis added). Unlike Cloutman, on whose testimony Dr. Smith relies, none of these attorneys routinely provides similar services to those of Bundren and Shackelford, i.e., plaintiff's civil rights and employment discrimination representation. The court

---

[19]Shackelford avers that, in another case in this court involving civil liberties and religious rights, he was awarded in early 2004 attorney's fees at an hourly rate of $350 for work done primarily in 2003. Although the court will consider this evidence in determining a reasonable rate for his work in this case, this is not proof of customary rates charged to and paid by fee-paying clients.

thus finds that their testimony is outweighed by Cloutman's.[20]

Dr. Smith also relies on Cloutman's affidavit to rebut the attorney affidavits on which Barrow relies.[21]  Cloutman is a Dallas attorney with over 36 years' experience.  He practices in the area of plaintiff's civil rights and labor and employment, and he has been a board-certified specialist in labor and employment law since 1975, when certification by examination first became available in Texas. He has litigated numerous claims brought under 42 U.S.C. §§ 1981, 1982, 1983, 1973, and 2000e.[22]  Cloutman opines that, for plaintiff's civil rights attorneys in the Northern District of Texas with 20 to 30 years of experience, hourly rates range between $250 to $350 depending on the complexity of the case and the degree of recovery obtained.  He states that this case "does not have the appearance of complex litigation," D. ADR Resp. 1: 6, and that "[t]he 'lodestar' rate should be set in light of the *lack* of complexity of this litigation." *id.* at 7 (italics substituted for bold font).  He recommends that Bundren's rate be set somewhere in the middle of the $250 to $350 per hour range.

Based on Cloutman's extensive experience and skill in the type of litigation involved in this case and his ability to opine concerning the prevailing market rate charged for similar services by

_____

[20]Because the court does not rely on LaBrec's deposition, it need not address Dr. Smith's contention that LaBrec's testimony contradicts the rates charged by senior partners in his firm.

The court likewise need not address in detail Dr. Smith's fourth argument, in which he contends that, in the two cases where Bundren was awarded unusually high hourly rates, the defendants did not contest the rates.  In neither Barrow's reply brief nor in Bundren's affidavit does Barrow specifically rely on the fee awards in those cases to support Bundren's claimed hourly rate in this case.

[21]Cloutman's affidavit is dated June 11, 2004.  Although a period of 18 months has elapsed since then, and substantial proceedings have since taken place, the court finds that his opinion concerning a reasonable hourly rate—which is stated as a range—is entitled to the weight the court gives it.  In particular, when Cloutman expressed his opinion, he was aware that Barrow sought $450 per hour for Bundren's services and $400 per hour for Shackelford's.

[22]Cloutman has capably tried cases before this court and has appeared in several suits over a period of several years.

lawyers of reasonably comparable skill, experience, and reputation, the court finds persuasive his opinion concerning what is the range of a reasonable hourly rate.  Having considered the record in this case, including the attorney's fee submissions, and Bundren's skill, experience, and reputation, the court finds that the reasonable hourly rate for his services is $300.  Shackelford has less experience than the range of 20 to 30 years on which Cloutman based his opinion.  Based on the same considerations of skill, experience, and reputation, the court sets Shackelford's hourly rate at $250.[23]

VII

The court next calculates the lodestar fee and considers the *Johnson* factors.

A

For the reasons explained above, the court reduces Bundren's claimed time as follows.  From the total claimed hours of 3,703.85, the court subjects 2,177.15 block-billed hours to a 20% reduction (i.e., 435.43 hours).  The court thus reduces the total of 3,703.85 hours by 435.43 hours based on block billing.  The court makes three additional percentage reductions from the sum of 3,703.85: 20% for unreliable records (740.77 hours), 5% for unreasonable legal research (185.19 hours), and 20% for vague descriptions (740.77 hours).  The court also deducts 39.2 hours based on objections sustained to specific services.  This results in a total number of approved hours of 1,562.49 for Bundren's services.  The court multiplies this by the hourly rate of $300, resulting in a lodestar of $468,742.00.

Concerning Shackelford, from the total claimed time of 568.3 hours, the court subjects 340

---

[23]Although these findings might warrant correspondingly lower rates for Sasser and Saenz, Dr. Smith does not expressly challenge their rates, and the court will not adjust them lower in the absence of a specific objection and argument that supports such an adjustment.

block-billed hours to a 10% reduction (i.e., 34 hours). The court thus reduces the total of 568.3 by 34 hours based on block billing. The court makes two additional percentage reductions from the total claimed hours of 568.3 hours: 5% for unreasonable legal research (28.41 hours), and 10% for vague descriptions (56.83 hours). The court also deducts 23.4 hours based on objections sustained to specific services. This results in a total number of 425.66 approved hours for Shackelford's services. The court multiplies this by the hourly rate of $250, resulting in a lodestar of $106,415.00.

Based on the foregoing findings and reasoning, the court reduces Sasser's time by 116.9 hours, resulting in 103.7 hours. Multiplying Sasser's hours by the hourly rate of $205.00 yields a lodestar fee of $21,258.50. The court reduces Saenz's time by 86.9 hours, resulting in 199.3 hours. Multiplying Saenz's hours by the hourly rate of $175.00 yields $34,877.50.

The sum of the attorney's fees for all of Barrow's attorneys is the lodestar fee of $631,293.00.

B

After calculating the lodestar, the court is obligated to consider whether it should be adjusted upward or downward based on the *Johnson* factors. *Rutherford*, 197 F.3d at 192.[24] The court "must be careful, however, not to double count a *Johnson* factor already considered in calculating the lodestar when it determines the necessary adjustments." *Shipes*, 987 F.2d at 320. Dr. Smith has not

---

[24]The *Johnson* factors are as follows: (1) the time and labor required for the litigation; (2) the novelty and complication of the issues; (3) the skill required to properly litigate the issues; (4) whether the attorney was precluded from other employment by the acceptance of this case; (5) the attorney's customary fee; (6) whether the fee is fixed or contingent; (7) whether the client or the circumstances imposed time limitations; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the attorney-client relationship; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717-19.

requested an adjustment to the lodestar based on the *Johnson* factors, nor has he discussed the applicability of the factors in this case.  Nevertheless, the court has considered each of the 12 factors.  The court concludes that, with the exception of the eighth, each factor is either subsumed within the lodestar calculation or is not sufficiently pertinent to the facts of the case to warrant discussion.  *See Curtis v. Bill Hanna Ford, Inc.*, 822 F.2d 549, 552 (5th Cir. 1987) ("In applying [the *Johnson* factors], the district court must explain the findings and the reasons upon which the award is based.  However, it is not required to address fully each of the 12 factors." (citation omitted)).

The eighth factor is "[t]he amount involved and the results obtained."  *Johnson*, 488 F.2d at 717-19.  "Indeed, 'the most critical factor' in determining the reasonableness of a fee award 'is the degree of success obtained.'"  *Farrar v. Hobby*, 506 U.S. 103, 114 (1992) (quoting *Hensley*, 461 U.S. at 436).  "[I]f 'a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount.'"  *Id.* (quoting *Hensley*, 461 U.S. at 436).

From a non-monetary standpoint, Barrow clearly obtained excellent results.  The gravamen of her suit was that Dr. Smith refused to interview or promote her unless she placed her children in public school, thereby violating her constitutionally protected right as a public-school employee to select a private-school education for her children.  She sought relief under § 1983 for violations of her rights under the First and Fourteenth Amendments and on state-law causes of action arising under Chapter 110 of the Texas Civil Practice and Remedies Code and Article I, § 6 of the Texas Constitution.  She also alleged a Title VII claim against Dr. Smith that was dismissed early in the case.  Barrow did not prevail on each legal theory, but "claims for relief that involve a common core of facts, or derive from related legal theories, cannot be viewed as a series of discrete claims."

- 36 -

*Hernandez v. Hill Country Tel. Coop.*, 849 F.2d 139, 144 (5th Cir. 1988). Moreover, she established

by her lawsuit that her constitutional right had been violated, that she had sustained actual damages

as a result, and that Dr. Smith should be punished for his conduct through an award of punitive

damages. Before trial, she prevailed in the Fifth Circuit, securing a ruling that "the constitutional

right of public-school employees to select a private-school education for their children was clearly

established when Smith refused to consider Barrow for the position of assistant principal." *Barrow*,

332 F.3d at 848. When her success is viewed without reference to the damages award, no reduction

in the lodestar is warranted based on the eighth *Johnson* factor. *See Hensley*, 461 U.S. at 435

("Where a plaintiff has obtained excellent results, . . . . the fee award should not be reduced simply

because the plaintiff failed to prevail on every contention raised in the lawsuit. . . .  The result is

what matters.").

   The court's analysis does not end, however, with the assessment of Barrow's success in

establishing her right to recover judgment against Dr. Smith.  "The amount of damages a plaintiff

recovers is certainly relevant to the amount of attorney's fees to be awarded. . . ." *City of Riverside*

*v. Rivera*, 477 U.S. 561, 574 (1986) (plurality opinion). Barrow recovered $35,455.00 in actual and

punitive damages. The lodestar fee is therefore over 17 times the monetary result Barrow obtained.[25]

   "An attorneys' fee award does not need to be commensurate with the actual amount of

dollars awarded to the plaintiff." *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 663 (5th

Cir. 2002). "A rule that limits attorney's fees in civil rights cases to a proportion of the damages

awarded would seriously undermine Congress' purpose in enacting § 1988." *City of Riverside*, 477

---

[25]Interest is not included in the results obtained for purposes of comparing the results with
the fee award. *See Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1048 n.6 (5th Cir. 1998).

- 37 -

U.S. at 576.  Thus

> [i]n the absence of other *Johnson* factors justifying a reduction in a fee award, a district court should not reduce the fee award solely because of a low damages award.  Such an approach would lead to a proportionality requirement between the amount of attorney's fees and the amount of damages and was explicitly rejected by the Court in *Riverside*.

*Cobb v. Miller*, 818 F.2d 1227, 1235 (5th Cir. 1987); *accord Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 392 (5th Cir. 2000).  Nevertheless, "[t]he amount of damages a plaintiff recovers is . . . one of many factors that a court must consider when calculating an award of attorneys' fees." *Green*, 284 F.3d at 663.  While "[t]here is no *per se* requirement of proportionality in an award of attorney fees under 42 U.S.C. § 1988[,] . . . proportionality is an appropriate consideration in the typical case."  *Hernandez*, 849 F.2d at 144 (citing *City of Riverside*, 477 U.S. 561).

The court's consideration of proportionality requires that it "give primary consideration to the amount of damages awarded as compared to the amount sought."  *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1048 (5th Cir. 1998) (addressing Title VII claim) (quoting *Farrar*, 506 U.S. at 114). In the June 2001 report of Barrow's damages expert, J. Herbert Burkman, Ph.D. ("Dr. Burkman"), he opined that her net income losses ranged from $70,008.00 to $109,091.00, and her net pension losses ranged from $32,464.00 to $70,022.00.  Nov. 5, 2004 App. to D. Mot. for Summ. Judgment 606.  He concluded under all three scenarios that her lost past income was $15,455.00.  *Id.* at 701. He opined that the present value of her lost future income ranged from $54,553.00 to $93,636.00. *Id.*  When added to $15,455.00, these figures account for the $70,008.00 to $109,091.00 range of damages.  He opined that the present value of her lost pension income ranged from $32,464.00 to $70,022.00.  *Id.*  Together, her past and future damages ranged from $102,472.00 to $179,113.00.

In his November 2003 updated report, however, Dr. Burkman reduced the three scenarios

to one and revised his overall opinion downward based on updated information.  He increased the amount of back pay from $15,455.00 to $25,454.00.  *Id.* at 693.  But he opined that the present value of Barrow's future net lost income was $10,998.00.  *Id.*  The reduction resulted from Barrow's promotion to an administrative position in academic year 2001-02.  *Id.* at 694.  For similar reasons, he also reduced the present value of her future net lost pension income to $8,398.00.  *Id.*

Consistent with Dr. Burkman's updated report, in closing argument Barrow asked the jury to award $25,000 for lost back pay and $19,000 for lost future pay.  The jury returned a verdict of $15,455.00 for lost earnings in the past—effectively adopting Dr. Burkman's June 2001 opinion over his November 2003 opinion—and $0 for lost earnings that she would likely suffer in the future, rejecting the claim that she would suffer any lost future pay or pension benefits.

In analyzing the amount of damages awarded to the amount sought, the court concludes first that the proper comparison is between what Barrow sought at trial based on the November 2003 expert opinion and what the judgment awarded based on the verdict.  Barrow should obtain the benefit of lowering her damages claim during the course of the litigation based on the fact that she had been promoted.  The court should not compare the damages the judgment awards her against what she sought before a promotion effectively reduced her monetary damages.  This is true in any case in which a plaintiff has a duty to mitigate damages, and it is particularly true in this case, since Dr. Smith argued by pretrial motion and at trial that Barrow had failed to mitigate her damages.

Comparing the judgment with what Barrow sought at trial based on Dr. Burkman's November 2003 opinion, the court holds that the lodestar should not be reduced.  Barrow obtained approximately 35% of the actual damages she sought.  Although this is comparatively small when

viewed only as a percentage, it is only $28,545.00 shy of the actual damages sought.[26] Additionally, in response to her request for an unspecified amount of punitive damages, the jury awarded $20,000, a sum that exceeds the actual damages. Together, the actual and punitive damages total approximately 80% of the actual damages requested. Considering these facts together, the court declines based on the eighth *Johnson* factor to adjust the attorney's fee award based on the proportionality of the damages award to the lodestar.

VIII

Dr. Smith argues that Barrow's fee request should be reduced because of numerous settlement offers. He reasons that even if his offers of judgment under Fed. R. Civ. P. 68 were not technically effective, they are proof that Barrow's fee application should be drastically reduced. The only case from this circuit that Dr. Smith cites in support of this proposition is *Jason D.W. v. Houston Independent School District*, 158 F.3d 205 (5th Cir. 1998) (per curiam).[27] *Jason D.W.* concerned an award of attorney's fees under 20 U.S.C. § 1415, the fee-shifting provision of the Individuals with Disabilities in Education Act. Section 1415 (e)(4)(F)(i) provides for a reduction of attorney's fees when the fee applicant has unreasonably protracted litigation by, for example, refusing to accept a reasonable settlement offer. *Jason D.W.*, 158 F.3d at 211. Because § 1988

---

[26]The court recognizes that, in *Migis*, the panel reversed a fee award where the plaintiff obtained only approximately 24% of the actual damages sought. *See Migis*, 135 F.3d at 1048 (plaintiff requested $50,000 in compensatory damages and was awarded $12,233.32). But unlike the instant case, in *Migis* the plaintiff had originally sought $325,000 in back pay and benefits and punitive and compensatory damages, recovered only $12,233.32, and the amount sought was "over twenty-six times the damages actually awarded." *Id.* Additionally, unlike this case, where Barrow prevailed against Dr. Smith on the central theory of her case, in *Migis* the plaintiff prevailed on only one act of discrimination that supported one theory of recovery. *Id.*

[27]Dr. Smith also cites three cases from the Seventh Circuit.

- 40 -

contains no such provision, *Jason D.W.* is inapposite.  The court is not aware of any binding precedent, and Dr. Smith has not directed the court to none, that holds that the court can reduce a fee award based on a plaintiff's refusal of an offer of judgment that is not effective under Rule 68. Consequently, the court declines to do so in this case.

IX

Dr. Smith next maintains that his Rule 68 offers were effective.  For the reasons that follow, the court holds they were not.

As the court explained in *Barrow VI*, in order for Rule 68 to benefit Dr. Smith, the value of the judgment Barrow obtained, plus the value of Barrow's pre-offer court costs and attorney's fees, must not exceed $100,000 before January 18, 2001, and must not exceed $154,666.00 before September 8, 2004.  *See, e.g., Barrow VI*, 2005 WL 1867292, at *26 (addressing January 18, 2001 offer) ("[F]or purposes of conducting the comparison called for by Rule 68, the court must compare Dr. Smith's offer to the value of the judgment Barrow obtained ($38,422.44), plus the value of the sum of Barrow's pre-offer court costs and attorney's fees, to ensure the comparison of like 'judgments.'").  "Because Barrow pursued her constitutional claims under § 1983, as a prevailing plaintiff, Barrow would be entitled to recover reasonable attorney's fees as part of her costs pursuant to 42 U.S.C. § 1988.  Thus in the instant case, the 'costs' mentioned in Rule 68 encompass not only Barrow's taxable court costs, but also her reasonably-incurred attorney's fees."  *Id.* at *18 (citation omitted).  And as the court explains below in addressing Barrow's requests for out-of-pocket expenses, § 1988 fee awards also include reasonable out-of-pocket expenses that are part of the costs normally charged to a fee-paying client.  *See infra* § XI(B).  Accordingly, if the sum of the value of Barrow's $38,422.44 judgment, plus her reasonable pre-offer costs and attorney's fees, plus her

- 41 -

reasonable out-of-pocket expenses that are recoverable as part of her attorney's fees, exceeds $100,000 or $154,666.00 on the relevant date, Rule 68 does not result in a denial of attorney's fees and costs.

The court first considers the $100,000 offer of judgment made on January 18, 2001. Barrow seeks the sum of $176,175.00 for the services of Bundren and Shackelford through January 16, 2001. This amount is based on 482.1 hours for Bundren, at the hourly rate of $350, and 24.8 hours for Shackelford, at the hourly rate of $300. Were the court to apply to these claimed hours the percentage cuts specified above and calculate the lodestar using the rates Barrow seeks, the attorney's fees would exceed the $61,577.56 threshold (i.e., $100,000 - $38,422.44) that, combined with the $38,422.44 award of actual and punitive damages and prejudgment interest, is necessary to exceed Dr. Smith's $100,000 Rule 68 offer.[28]  Of course, the court has today approved lower hourly rates for each attorney.  At these 2005 rates (there is insufficient evidence in the record to enable the court to calculate in a non-arbitrary manner any lower rates for the 1998-2001 period), and applying the percentage cuts, Barrow falls $6,287.56 short of meeting the $100,000 threshold.[29] The court finds, however, from its entry-by-entry study of the time records for the period August 27, 1998 through January 17, 2001 that, at least for the following reasons, it should not apply the

_____

[28]The court would deduct 65% from Bundren's 482.1 hours, resulting in 168.8 hours, and multiply those hours by the rate of $350, for a total of $59,080.  It would deduct 25% from Shackelford, resulting in 18.6 hours, and multiply those hours by the rate of $300, for a total of $5,580.  Together, the fees would exceed the $61,577.56 threshold.  (For mathematical simplicity, the court calculates all threshold sums in the amounts necessary to equal Dr. Smith's offers.  The court recognizes that it must add one penny to these sums to exceed the offers.)

[29]Based on the rates approved today, Bundren's 168.8 hours would be valued at $50,640 and Shackelford's 18.6 hours would be valued at $4,650, for a total of $55,290, leaving Barrow $6,287.56 short of the $100,000 threshold.

percentage cuts according to a methodology that would trigger the preclusive effect of Rule 68.[30]

First, the percentage cuts are based on a fair and reasonable analysis of almost seven years of legal services (including five years of litigation), but they are less precise when overlaid on discrete periods of time.  The prelitigation and litigation activities covered by the 1998-2001 time period are not in all respects like those found throughout the entire life of this case.  Particularly given the closeness of the amount necessary to put Barrow over the threshold ($6,287.56), the court cannot justify using what might be termed rough percentages to decide a question that calls for precision.

Second, Barrow's counsel have written off many hours during this period, and Barrow does not seek compensation for the non-billable services.  Several of these hours include legal research.  Although the court would have at least applied a 5% reduction for legal research and might have applied the other percentage reductions, it likely would not have disapproved the hours in their entirety.  At Bundren's and Shackelford's court-approved hourly rates ($300 and $250), it would not require reinstatement of very many of the hours written off to make up the $6,287.56 shortfall.

Third, Barrow has not sought any compensation for a substantial number of hours incurred by legal associates and legal assistants.  Under § 1988 these types of services are recoverable at market value if the prevailing practice in the relevant community is to bill these services directly to clients.  *LULAC*, 119 F.3d at 1235 (citing *Missouri*, 491 U.S. at 286-88).  While the court will not award today fees that Barrow does not seek, the court can rely on her counsels' exercise of billing

---

[30]This reasoning applies regardless of the hourly rate the court uses in assessing this time period.  In other words, even if the court could use the 2005-approved rates for Bundren and Shackelford as starting points, and had a basis in the record to extrapolate backward in time to use lower rates for the 1998-2001 period, the result would be the same.

judgment to justify its decision not to apply the percentage cuts uniformly to the 1998-2001 period to trigger the effect of Rule 68.

After considering these factors and conducting an extensive review of the pre-January 18, 2001 records, the court finds that, as of January 18, 2001, Barrow's court costs and attorney's fees exceeded $61,577.56. Consequently, the value of the judgment Barrow obtained, plus the value of Barrow's pre-offer court costs and attorney's fees, exceeded $100,000. Dr. Smith's Rule 68 offer of judgment does not entitle him to relief.

The court next considers the September 8, 2004 offer of $154,666.00. This offer can be addressed in short order. The court finds that, as of September 7, 2004, a date that followed extensive, additional pretrial motion practice and proceedings, including a successful appeal to the Fifth Circuit, Barrow had incurred far more than the sum of $116,243.56 in attorney's fees that was necessary to overcome the offer of judgment.

Accordingly, the court holds that Dr. Smith's offers of judgment do not preclude Barrow from recovering her attorney's fees and costs.[31]

X

Finally, Dr. Smith argues that Barrow's fee application should be rejected in its entirety because Bundren's records show evidence of fraud or gross incompetence. He relies on the alterations that Bundren made to his time records, the inhuman number of hours Bundren claims to have worked in this case, *Chiu*, and *Williams*, and his contemporaneous work on at least 14 other cases (including appeals to the Fifth Circuit and the Texas Supreme Court). Dr. Smith requests that,

---

[31]The court addressed Dr. Smith's August 23, 2000 $30,000 offer of judgment in *Barrow VI*. *See Barrow VI*, 2005 WL 1867292, at *24.

if the court concludes that he has provided insufficient evidence to justify complete rejection of the fee application, he be allowed to conduct discovery to compare Bundren's time records in other cases with those he submitted in this case, *Chiu*, and *Williams*.

The court declines on the grounds asserted to reject Barrow's fee application in its entirety, and it also denies Dr. Smith's request for discovery. The court's analysis of the question whether Bundren was grossly incompetent in how he maintained his time records in this case, or even in *Chiu* or *Williams*, is subsumed in its decisions concerning whether Barrow's fee application should be reduced based on factors the court has already addressed. In other words, if Bundren was grossly incompetent in how he recorded his time, such conduct has resulted in the fee reductions that the court has already made based on recognized standards. Whether the reductions result from gross incompetence or mere negligence or ineptitude is not determinative. His timekeeping practices have resulted in his loss of fees that he might otherwise have been able to support had he kept time properly.

The allegations that Bundren's records contain "indicia of fraud," D. Resp. 10, or "evidence of fraud," D. Br. 24, are very serious charges. Based on its careful study of the record developed in this case, including Bundren's billing records, the court is not prepared to find that Bundren engaged in fraudulent billing practices. Such a conclusion would require a finding of scienter that the court will not make on a paper record and for which there are insufficient grounds to warrant an evidentiary hearing.[32] At a minimum, however, what has come to light concerning Bundren's billing

---

[32]In *Williams* Judge Lindsay assessed similar evidence from this case, *Chiu*, and *Williams* in the context of deciding a motion for new trial on the issue of attorney's fees and request for leave to take related discovery. *See Williams*, No. 3:97-CV-0875-L (N.D. Tex. Mar. 15, 2004) (Lindsay, J.). He observed concerning five instances of questionable entries (grossly excessive hours billed on five days) that they raised both the possibility of fraud and the possibility that the entries resulted

- 45 -

practices from the analysis of his time records in this case, *Chiu*, and *Williams* warrants his making immediate and substantial changes in those practices, if he has not done so already.

XI

Barrow seeks reimbursement for the following categories of costs and expenses, totaling $104,161.41: mediation fee, deposition transcripts, office and vendor duplication (photocopies), telecopies (facsimiles), filing fees/court costs, attorney travel, delivery/courier services, expert witnesses, telephone charges, and other (courtroom equipment). Barrow bears the burden of supporting her request for costs and expenses with evidence documenting the costs incurred. *Wright v. Blythe-Nelson*, 2004 WL 2870082, at *9 (N.D. Tex. Dec. 13, 2004) (Fitzwater, J.) (citing *Waggoner v. Trans Union, LLC*, 2003 WL 22838718, at *2 (N.D. Tex. Nov. 24, 2003) (Fish, C.J.)). Dr. Smith objects to Barrow's claimed expenses, contending the request should be denied or reduced because the claimed expenses are not sufficiently supported, are unavailable or limited by statute, or are not recoverable because they are unreasonable, are unrelated to her claims against Dr. Smith, or relate to matters that she lost. He also maintains that she is estopped from requesting or receiving costs and expenses to the extent she fails to meet the specificity standards on which she relies to object to GISD's bill of costs.

---

from "lack of attention to detail, simple mistake, or some other unintentional conduct." Slip op. at 5. He noted that these instances represented but a small number of thousands of time entries spanning a period of seven to eight years. *Id.* at 5-6. Although he held that challenges to time entries in the present case should be raised in this litigation, *id.* at 6-7, he also concluded that the occurrence of errors in *Chiu* or this case "simply does not suggest that fraud was perpetrated on the court regarding attorney's fees in [*Williams*]," *id.* at 7.

A

The court first considers whether the expenses Barrow seeks are recoverable under 28 U.S.C.

§ 1920.[33]   Under § 1920 Barrow's expenses for deposition transcripts are available if the materials

were necessarily obtained for use in the case.  *Wright*, 2004 WL 2870082, at *10.   Photocopy

expenses are compensable if the copies were necessarily obtained for use in the litigation.  *Id.*  Court

costs that are specified in § 1920 are taxable.  *See* 28 U.S.C.§ 1920; *Crawford Fitting Co. v. J. T.*

*Gibbons, Inc.*, 482 U.S. 437, 439-40 (1987) (holding that costs specified in § 1920 are taxable),

*superseded in part by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074.

Telecopy (facsimile) charges, attorney travel expenses, delivery/courier services fees, and telephone

charges, are not recoverable under § 1920.  *Wright*, 2004 WL 2870082, at *10.   Neither are

mediation fees, *see Mota v. University of Texas Houston Health Science Center*, 261 F.3d 512, 530

(5th Cir. 2001), nor expert witness fees or courtroom equipment costs, which are not enumerated

in § 1920, *see, e.g., Gaddis v. United States*, 381 F.3d 444, 451-52 (5th Cir. 2004) (en banc) (holding

---

[33]28 U.S.C. § 1920:

> A judge or clerk of any court of the United States may tax as costs the
> following:
> (1) Fees of the clerk and marshal;
> (2) Fees of the court reporter for all or any part of the stenographic
> transcript necessarily obtained for use in the case;
> (3) Fees and disbursements for printing and witnesses;
> (4) Fees for exemplification and copies of papers necessarily
> obtained for use in the case;
> (5) Docket fees under section 1923 of this title;
> (6) Compensation of court appointed experts, compensation of
> interpreters, and salaries, fees, expenses, and costs of special
> interpretation services under section 1828 of this title.
> A bill of costs shall be filed in the case and, upon allowance, included
> in the judgment or decree.

that, under *Crawford Fitting*, only expenses listed in § 1920 are recoverable).

1

Barrow requests deposition expenses in the amount of $20,128.22. Costs related to taking depositions and obtaining stenographic copies of depositions are allowed if the materials were necessarily obtained for use in the case. *Wright*, 2004 WL 2870082, at *10 (citing *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 536 (5th Cir. 1999); *Waggoner*, 2003 WL 22838718, at *2). As evidence of her deposition expenses, Barrow first submits a letter from Janis Rogers & Associates ("JRA") listing the invoices WCBA has paid in this case, which total $16,133.47. Barrow also submits a letter from Jill Johnson Court Reporting that reflects deposition fees in the amount of $2,901.75. Finally, in her fee application, Barrow requests reimbursement for $1,193.00 with the description "Rogers, Harris (dep. Gib Weaver Lubbock, Texas 6/2001)," P. Am. Applic. 2, but she submits no letter or invoice to support this expense.

Dr. Smith objects specifically to 17 entries (for subpoenas, depositions, and nonappearance fee) reflected on the JRA letter, totaling $5,573.98. First, he objects to fees for the depositions and subpoenas for GISD School Board members, arguing that their testimony was relevant only to issues related to Barrow's claims against GISD. Second, he objects to the depositions by written questions that Barrow attempted to conduct but that the court concluded were unwarranted. Third, he objects to the deposition-related fees for persons who were not called as witnesses. Fourth, he objects to the fees resulting from Barrow's failure to appear at a deposition she called.

The court disallows these expenses. First, in her reply brief, Barrow has made no attempt to show that these depositions were necessarily obtained for use in her case against Dr. Smith. Second, the court will not allow recovery of expenses for depositions on written questions that the

- 48 -

court earlier found were unwarranted or for a nonappearance by the plaintiff.

Dr. Smith also objects generally to the remaining deposition expenses. He contends that Barrow is estopped from requesting deposition expenses contrary to the standards on which she relies in objecting to GISD's bill of costs. As the court notes below, Barrow objects to GISD's request for deposition expenses on the ground, *inter alia*, that GISD relies on letters from court reporters—ironically, the very same reporters on which Barrow relies—contending the letters are hearsay and that the best evidence of what GISD actually paid would be the invoices and copies of checks.

Although Barrow's position in objecting to GISD's bill of costs is inconsistent with the approach she has taken in her own fee application, Dr. Smith has not demonstrated that she is legally estopped on that basis from applying for the deposition expenses at issue. He has not preserved any other objections to the remaining deposition expenses, and the court overrules his objections except to the extent set forth above.[34]  The court deducts $5,138.13 from the total claimed amount of $20,128.22 for deposition expenses, resulting in a net award of $14,990.09.

2

Barrow seeks $8,813.15 for office and vendor duplication (photocopies), including $8,661.20 through WCBA's records and $151.95 through Liberty's records. "Before the district court can tax costs for photocopies, it must find that the copies for which costs are sought were necessarily obtained for use in the litigation." *Holmes v. Cessna Aircraft Co.*, 11 F.3d 63, 64 (5th Cir. 1994) (per curiam). "Moreover, [Barrow] must offer some proof of the necessity." *Id.* Although Barrow

---

[34]Additionally, for reasons explained *infra* at § XII, the court has overruled Barrow's objections to GISD's request for reimbursement for deposition transcripts.

is not required to "identify every xerox copy made for use in the course of legal proceedings," *Fogleman v. ARAMCO (Arabian American Oil Co.)*, 920 F.2d 278, 286 (5th Cir. 1991), she is expected to "demonstrat[e] that reproduction costs necessarily result from that litigation," *id.*

WCBA's records contain 79 pages of entries for photocopies; Liberty's photocopy entries are contained in seven pages of expenses.  Each entry discloses the date, the person who made the copies, and the cost.  With the exception of some of the Liberty entries, however, Barrow does not categorize the photocopies or otherwise indicate what was copied or how it was used.  Beyond Bundren's broad statement that the expenses, including deposition expenses, "are reasonable and the type of expenses that lawyers in Dallas, Texas normally bill their clients," P. App. 46-47, Barrow has provided no information by which the court can determine the necessity of the photocopies.[35] In *Wright* the court relied on similar reasoning to reject a request for reimbursement for photocopies. *See Wright*, 2004 WL 2870082, at *10 (declining to award such expenses where billing statements contained 33 pages of entries for photocopies and, although each entry contained date, person who made the copies, and cost, applicant did not categorize photocopies or otherwise indicate what was copied or how it was used and, beyond counsel's broad statement that all expenses were necessarily incurred in prosecuting lawsuit, she provided no information by which court could determine necessity of photocopies).

The court has determined from the Liberty records that the sum of $15.06 in photocopying expenses meets the controlling standard.  The court therefore denies Barrow's request for office and vendor duplication expenses except in the amount of $15.06.

---

[35]Bundren also avers that he has written off $53,336.32 in duplication expenses during the period January 19, 2001 through June 30, 2003.  P. App. 46.

3

Barrow seeks court costs in the amount of $250.  Her request is based on two entries: one on April 28, 2000 for $150 with the description "Filing Fees," P. App. 819, and one on May 10, 2000 for $100 with the description "Court Costs," *id.*  Apart from these descriptions, Barrow submits no other evidence or explanation to support the costs.  The court will allow the $150 filing fee but disallows the $100 nondescript court costs because Barrow has not met her "burden of furnishing a reasonable accounting." *Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1099 (5th Cir. 1982), *overruled in part by J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193, 1195 (5th Cir. 1988); *see also Wright*, 2004 WL 2870082, at *11.

B

Barrow argues in her reply brief that her expenses, including expert witness fees, that are limited by §§ 1920 and 1821 are recoverable as part of the attorney's fees under an amendment to the Civil Rights Act of 1991 ("CRA").  She posits in her brief and reply brief that reimbursement for out-of-pocket expenses incurred by the prevailing party's counsel and normally charged to fee-paying clients are part of the attorney's fees award and are not subject to §§ 1920 and 1821.  Dr. Smith asserts in his ADR briefing and in his fee application briefing that, even if Barrow can recover out-of-pocket expenses that are not explicitly listed in § 1920, the expenses she seeks should be severely limited.  He contends that §§ 1920 and 1821 limit the award of expert witness fees.  The court addresses first whether the mediation fee, telecopy (facsimile) charges, attorney travel expenses, delivery/courier services fees, telephone charges, and courtroom equipment fees are otherwise recoverable.

In *Associated Builders & Contractors of Louisiana, Inc. v. Orleans Parish School Board*,

919 F.2d 374 (5th Cir. 1990), the Fifth Circuit held that "[a]ll reasonable out-of-pocket expenses, including charges for photocopying, paralegal assistance, travel, and telephone, are plainly recoverable in section 1988 fee awards because they are part of the costs normally charged to a fee-paying client." *Id.* at 380 (citing *Int'l Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174, 1185 (5th Cir. 1986); *Missouri*, 491 U.S. 274).   Dr. Smith does not contest that expenses for mediation fees, telecopy (facsimile) charges, attorney travel expenses, delivery/courier services fees, telephone charges, and courtroom equipment fees are normally charged to a fee-paying client.   The only expenses that Barrow currently claims, that have not already been addressed in this opinion (i.e., photocopying), and that Dr. Smith specifically challenges, are attorney travel expenses, facsimiles, and long distance.   The amounts that Barrow now seeks for these expenses are considerably less than those at issue in the ADR procedure.   Dr. Smith does not sufficiently explain in his present briefing why these requests are still objectionable.[36]   Accordingly, the court awards Barrow reimbursement for these claimed expenses under § 1988.

C

Barrow seeks expert witness fees totaling $67,456.48 for four separate experts: David Sharp ("Sharp")—$906.25; LaBrec—$31,333.88; Dr. Burkman—$15,543.75; and Campbell—$19,672.60.

Recovery of expert witness fees is governed by § 1920(6) (court appointed experts) and § 1821(a)(1) (addressing, *inter alia*, any witness in attendance at any court of the United States or

---

[36]In his fee application brief, Dr. Smith posits "regarding all other claimed expenses" that Barrow has failed to offer additional support beyond what she provided in the ADR procedure.  D. Br. 23.  He contends that, like Judge Sanders, the court lacks sufficient evidence to justify an award of expenses.  This assertion is not a sufficient objection to these expense items.  Dr. Smith also argues that, in Bundren's deposition, he admitted that his records do not show, in pertinent part, when telecopy expenses were incurred.  This deficiency does not question the reasonableness of such charges and whether a fee-paying client would reimburse counsel for them.

before any person authorized to take his deposition pursuant to any rule or order of a court of the United States).  The maximum allowable fee under § 1821(b) is $40 per day for an expert who testifies at trial or by deposition, and it is error to award a prevailing party expenses for expert witnesses that exceed this amount.  *See, e.g., Holmes*, 11 F.3d at 64 (vacating and remanding award that exceeded statutory allowable rate of $40 per day).   "Additionally, expert fees are not recoverable."  *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 891 (5th Cir. 1993) (citing 28 U.S.C. §§ 1821, 1920; *Crawford Fitting*, 482 U.S. 437).

Neither Sharp, LaBrec, nor Campbell testified at trial.  Sharp and LaBrec each testified one day by deposition.  Dr. Burkman testified on two different days at trial and testified one day by deposition.  Barrow is entitled to reimbursement at the rate of $40 per day for the trial and deposition testimony of these experts, totaling $200.  *See* 28 U.S.C. § 1821(a)(1), (b).

Barrow contends that the fees of these experts are compensable under § 1988 as a result of the amendment made to § 1988 by the CRA.  The CRA added subsection (c) to § 1988, explicitly providing for expert fees for parties prevailing on § 1981 and § 1981a claims.  *See* CRA, Pub. L. No. 102-166, § 113, 105 Stat. at 1079.  It does not include awarding expert fees in § 1983 cases.  *See* § 1988(c).  Because §§ 1920, 1821, and 1988(c) are all unavailing to Barrow, and because she directs the court to no other statutory authority under which she may be reimbursed, the court holds that Barrow cannot recover for expert witness expenses a sum greater than the $200 awarded based on § 1821(a)(1).

Based on the foregoing rulings, the court awards Barrow the following sums as expenses and taxable costs:

| | |
|---|---:|
| mediation fee | $1,316.00 |
| deposition transcripts | $14,990.09 |
| office and vendor duplication (photocopies) | $15.06 |
| telecopies (facsimiles) | $87.07 |
| filing fees/court costs | $150.00 |
| attorney travel | $2,537.64 |
| delivery/courier services | $0.00 |
| expert witnesses | $200.00 |
| telephone charges | $107.34 |
| courtroom equipment | $3,372.02 |
| | |
| TOTAL | $22,775.22 |

## XII

The court now considers Barrow's objections to GISD's bill of costs.  The clerk of court taxed GISD's costs in the amount of $19,741.13.  Barrow objects to the award, contending the court should deny all costs requested or substantially reduce the costs awarded.

### A

Barrow first objects to GISD's claim for $8,503.51 in photocopying expenses. She maintains that GISD has not shown their necessity for trial.  In response, GISD asserts that the copying costs listed were all actual and necessary in preparation for trial, they were for pleadings and trial preparation, and the copies were itemized and broken down and presented in the standard custom and practice for practicing in this district.  It posits that the shared costs are not being charged twice and that they were actual and necessary.

GISD's bill of costs includes seven pages of itemized photocopies that amount to $3,766.84 of her expenses.  For the remaining $4,736.37 in joint reproduction costs, which represents

photocopying that GISD shared with Dr. Smith, the bill of costs includes tables that summarize the photocopying expenses by month but that do not in any way categorize how the photocopies were used. As did Barrow when requesting reimbursement for photocopying expenses, GISD has the burden to "demonstrate that reproduction costs necessarily result from th[e] litigation." *Fogleman*, 920 F.2d at 286. GISD need not identify every photocopy, *id.*, but the court must be able to find that the copies were necessarily obtained for use in the litigation, and GISD must offer some proof of the necessity, *see Holmes*, 11 F.3d at 64.

The court has considered, item by item, the seven pages of itemized photocopies and finds that GISD has met its burden with regard to $3,255.03 in photocopying expenses. The descriptions for these copies are sufficient, coupled with the court's knowledge of the case and its procedural history, to indicate to the court what was copied and how it was used. GISD has neither met its burden concerning the balance of the itemized expenses nor concerning the summarized expenses. Accordingly, the court sustains Barrow's objection to the extent that it allows $3,255.03 in photocopying costs of GISD's claim for $8,503.51.

B

GISD requests $11,237.62 for deposition transcripts provided by two court reporters. Barrow objects based on hearsay and best evidence grounds to GISD's reliance on the court reporter letters to support this request. This objection is misplaced.

28 U.S.C. § 1924 provides:

> Before any bill of costs is taxed, the party claiming any item of cost or disbursement shall attach thereto an affidavit, made by himself or by his duly authorized attorney or agent having knowledge of the facts, that such item is correct and has been necessarily incurred in the case and that the services for which fees have been charged were actually and necessarily performed.

GISD's submission to the clerk of court complies with the statute.  It is supported by the affidavit

of Dennis J. Eichelbaum, Esquire, who states that he has personal knowledge of the facts stated, that

the summaries and/or invoices for taxable costs are true and correct, and that they have been

necessarily incurred in the case and that the services for which fees have been charged were actually

and necessarily performed.  Because GISD's submission satisfies § 1924, Barrow's hearsay and best

evidence objections lack force.

Barrow also objects to the deposition expenses on the ground that GISD has not shown why

they were necessary for trial.  She contends that GISD did not notice or request any depositions,

almost all witnesses at trial were GISD employees or Board members, and GISD's affidavit fails to

provide details of the description why the copies were necessary for trial.  She maintains that, if

GISD paid for the original transcript of any witness, it was a gratuitous expense because GISD could

have made photocopies or obtained such copies from Dr. Smith.[37]

Costs related to obtaining stenographic copies of depositions are allowed if the materials

were necessarily obtained for use in the case.  *Wright*, 2004 WL 2870082, at *10.  The court's

review of the depositions in question indicates that they were necessary.  GISD seeks reimbursement

for copies of depositions of 27 witnesses and one telephonic court hearing.  Of the 27 witnesses, 19

testified at trial.  Four of the remaining witnesses gave depositions concerning attorney's fees.  One

witness was excluded by virtue of a trial ruling concerning the admissibility of evidence.  Three

other persons, whom Barrow deposed, did not testify at trial but were listed as possible witnesses.

It was necessary that GISD obtain copies of all the depositions at issue.  The court therefore

---

[37]GISD demonstrates in its reply brief why it acted properly by paying court reporters for stenographic copies rather than making or obtaining photocopies.

overrules the objection.

Having considered Barrow's objections to GISD's costs, the court sustains in part and overrules in part the objections, reduces the taxable costs, and taxes GISD's costs against Barrow in the amount of $14,492.65.

XIII

Based on the foregoing rulings, the court grants the deferred portion of Barrow's April 11, 2005 post-trial motion to alter or amend the judgment to the extent of awarding Barrow her expenses and taxable costs of court against Dr. Smith.  The motion is otherwise denied in all respects.

*   *   *

For the reasons set out above, the court grants Barrow's application for attorney's fees from Dr. Smith to the extent set forth in this memorandum opinion and order, grants her motion to alter or amend the judgment to the extent of awarding Barrow her expenses and taxable costs of court against Dr. Smith, and sustains in part and overrules in part her objections to GISD's bill of costs. The court has filed an amended judgment today that gives effect to the rulings in this memorandum opinion and order.

**SO ORDERED**.

December 20, 2005.

SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 57 -